IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES ANDROS, III, individually and as Natural Father and Guardian of MEGHAN ELIZABETH ANDROS and ELIZABETH ANDROS, minors, | | HON. JEROME B. SIMANDLE |
| | | Civil No. 03-1775 (JBS) |
| Plaintiffs, | | |
| v. | | |
| ELLIOT M. GROSS, M.D., BRUCE K. DESHIELDS, ELADIO ORTIZ, JEFFREY BLITZ, ESQUIRE, MURRAY A. TALASNIK, ESQUIRE, HYDOW PARK, M.D., BARBARA FENTON, COUNTY OF ATLANTIC, STATE OF NEW JERSEY, | | |
| Defendants. | | |

| | | |
|---|---|---|
| JAMES ANDROS, III, individually and as Natural Father and Guardian of MEGHAN ELIZABETH ANDROS and ELIZABETH ANDROS, minors, | | Civil No. 04-5968 |
| | | **OPINION** |
| Plaintiffs, | | |
| v. | | |
| CHRISTOPHER WELLMAN, | | |
| Defendant. | | |

APPEARANCES:

Louis C. Bechtle, Esquire
James J. Rohn, Esquire
John A. Guernsey, Esquire
Howard M. Klein, Esquire
Kevin Dooley Kent, Esquire
CONRAD O'BRIEN GELLMAN & ROHN, PC
Laurel Oak Corporate Center
1000 Haddonfield-Berlin Road, Suite 202
Voorhees, New Jersey 08043
        Attorneys for Plaintiff James Andros, III, individually

Andrew R. Duffey, Esquire
LITVIN, BLUMBERG, MATUSOW & YOUNG
The Widener Building, 18th Floor
1339 Chestnut Street
Philadelphia, Pennsylvania 19107
        Attorneys for Plaintiff James Andros, III, as Father and
        Natural Guardian on behalf of Meghan Elizabeth Andros and
        Elizabeth Andros, minors

Russell L. Lichtenstein, Esquire
Michael Gross, Esquire
COOPER LEVENSON APRIL NIEDELMAN & WAGENHEIM, P.A.
1125 Atlantic Avenue, Third Floor
Atlantic City, New Jersey 08401-4891
        Attorneys for Defendant Elliot M. Gross, M.D.

Benjamin Clarke, Esquire
R. Brian McLaughlin, Esquire
Thomas A. Abbate, Esquire
DECOTIIS, FITZPATRICK, COLE, & WISLER, LLP
Glenpointe Centre West
500 Frank W. Burr Boulevard
Teaneck, New Jersey 07666
        Attorney for Defendants State of New Jersey, Jeffrey
        Blitz, Esquire, Murray A. Talasnik, Esquire, Eladio Ortiz,
        Bruce K. DeShields and Christopher Wellman

Donna M. Taylor, Esquire
ATLANTIC COUNTY DEPARTMENT OF LAW
1333 Atlantic Avenue, 8th Floor
Atlantic City, New Jersey 08401
        Attorney for Defendants County of Atlantic, Hydow Park,
        M.D., and Barbara Fenton

**SIMANDLE**, District Judge:

On February 23, 2004, this Court issued a 76-page Opinion which considered, in depth, the viability of many of the claims in the thirty-seven count Complaint filed by Plaintiff James Andros, individually and on behalf of his minor children Meghan Elizabeth Andros and Elizabeth Andros.[1] By the accompanying Order, the Court, <u>inter alia</u>, granted the motions for summary judgment filed by Blitz, Talasnik, DeShields and Ortiz on the grounds of federal immunity.

Plaintiffs subsequently moved for partial reconsideration of the February 23, 2004 Opinion and Order as to the Court's probable cause determination.  Additionally, Prosecutors Blitz and Talasnik, and Investigator DeShields (hereinafter "Defendants"), moved for dismissal and/or summary judgment on all remaining state law claims.[2] By Order date December 20, 2004, the Court permitted additional discovery and supplemental briefing.

---

[1] Defendants include Atlantic County Medical Examiners Elliot M. Gross, M.D. and Hydow Park, M.D., nurse Barbara Fenton, two members of the investigative section of the Atlantic County Prosecutor's Office, Sergeant Bruce DeShields and Lieutenant Eladio Ortiz, Atlantic County Prosecutor Jeffrey S. Blitz, Atlantic County First Assistant Prosecutor Murray A. Talasnik, the County of Atlantic, and the State of New Jersey.

[2] Though Defendants captioned this motion as a motion for dismissal and/or summary judgment, "[b]ecause the grant of summary judgment and the dismissal of the complaint are inconsistent," the Court here will treat the record as a summary judgment record.  <u>Strozyk v. Norfolk Southern Corp.</u>, 358 F.3d 268, 270-71 (3d Cir. 2004).

Meanwhile, on December 3, 2004, Plaintiffs filed a complaint against Defendant Christopher Wellman almost identical to the original complaint.  On December 21, 2004, the two actions were consolidated.  On April 8, 2005, Wellman filed a motion for summary judgment.

Despite the considerable time available to Plaintiffs to take additional discovery, the factual landscape known to the Court at the time of its February 23, 2004 Opinion has remained largely unchanged.  Accordingly, and for the reasons now stated, Plaintiff's motion for partial reconsideration will be denied, and the motions for summary judgment by Defendants Blitz, Talasnik, DeShields and Wellman will be granted.

## I.    BACKGROUND

This matter stems from an incorrect March 2001 autopsy report in which Atlantic County Medical Examiner Elliot M. Gross, M.D. concluded that the sudden death of Plaintiff's 31-year old wife, Ellen Andros, was the result of "asphyxia due to suffocation."  The autopsy report prompted a homicide investigation which uncovered evidence of great marital discord between Plaintiff and his wife, in which she was in fear for her life.  Eventually, Plaintiff was arrested and indicted for one count of first degree murder.

Plaintiff was innocent, as the Prosecutor's Office learned during final preparations for Plaintiff's criminal trial in late

2002.  Specifically, the Prosecutor's Office retained another pathologist, Donald Jason, M.D., to testify as an expert witness at trial.  After he reviewed the evidence Dr. Jason concluded that Ellen Andros had died from a spontaneously dissecting coronary artery, a natural cause of death.[3]  Dr. Gross, and his supervisor, Dr. Park, reviewed Dr. Gross's initial autopsy conclusion and, on December 3, 2002, indicated their agreement with Dr. Jason's conclusion – Ellen Andros had died of natural causes.  The indictment against Plaintiff was dismissed on the following day, December 4, 2002.

On April 22, 2003, Plaintiff filed the underlying action and, in the February 23, 2004 decision, the Court considered the viability of many of those claims in deciding the motions to dismiss filed by Gross, Park, Fenton, and the County of Atlantic, as well as the motion for summary judgment filed by Prosecutors Blitz and Talasnik, Investigators Ortiz and DeShields, and the State of New Jersey.  Plaintiffs timely moved for partial reconsideration of that decision, and Defendants moved for summary judgment on all remaining state law claims.  On April 8, 2005, Defendant Wellman moved for summary judgment.

The Court will treat with Plaintiffs' partial reconsideration motion first.

---

[3] Dr. Jason's findings were contained in his November 30, 2002 report.

5

## II.  MOTION FOR PARTIAL RECONSIDERATION

### A.    Standard of Review

"A party seeking reconsideration must show more than a disagreement with the court's decision, and recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." Panna v. Firstrust Sav. Bank, 760 F. Supp. 432, 435 (D.N.J. 1991) (internal citations omitted); Local Civil Rule 7.1(i) .  Instead, to justify relief on a motion for reconsideration, the moving party must show:

(1)   an intervening change in the controlling law;

(2)   the availability of new evidence that was not available when the court granted the motion for summary judgment; or

(3)   the need to correct a clear error of law or fact or to prevent manifest injustice.

See Max's Seafood Café v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999).

"Motions for reargument succeed only where a dispositive factual matter or controlling decision of law was presented to the Court but not considered."  Damiano v. Sony Music Entertainment, 975 F. Supp. 623, 634 (D.N.J. 1996) (quoting Pelham v. United States, 661 F. Supp 1063, 1065 (D.N.J. 1987)). Where no facts or cases were overlooked, the motion must be denied.  Resorts Int'l v. Greate Bay Hotel & Casino, 830 F. Supp. 826, 831 (D.N.J. 1992).  If the record was inadequately developed

6

on a particular issue, the court has discretion to reconsider the matter, <u>Hatco Corp. v. W.R. Grace Corp.</u>, 849 F. Supp. 987, 990 (D.N.J. 1994), but not to the extent of considering new evidence that was available but not submitted while the motion was pending. <u>Florham Park Chevron, Inc. v. Chevron, USA, Inc.</u>, 680 F. Supp. 159, 162 (D.N.J. 1988).

**B.   Analysis**

Plaintiffs assert, in the first instance, that this Court overlooked key evidence when it concluded that probable cause existed by April 6, 2001 to suspect Plaintiff of murdering his wife.  Accordingly, Plaintiffs' argue, the Court must correct this "clear error" to "prevent manifest injustice." Additionally, Plaintiffs claim that the evidence uncovered through additional discovery demonstrated that there is a dispute of fact whether probable cause existed in April 2001. Plaintiffs, however, overstate what has been uncovered through additional discovery.  For the reasons explained in the Court's February 23, 2004 Opinion, as well as in the discussion below, Plaintiffs' claims are, as they were before, without legal merit.

In its February 23, 2004 Opinion, the Court explained that "probable cause to arrest exists when the facts and circumstances are such that 'a reasonable person [would] believe that an offense has been . . . committed by the person to be arrested.' (Slip Op. at 56 (quoting <u>Orsatti v. New Jersey State Police</u>, 71

F.3d 480, 483 (3d Cir. 1995)).  The Court then detailed the
evidence which led it to conclude that, even viewed in the light
most favorable to Plaintiffs, there was probable cause to suspect
that Plaintiff had committed the crime on April 6, 2001:

> Dr. Gross issued his conclusion that Ellen had died as
> a result of homicide on March 31, 2001, the date of her
> death.  The prosecutors, though they may have
> immediately suspected plaintiff, did not have clear
> evidence that he committed the murder.  They were faced
> with contradictory evidence, namely his story, which he
> consistently maintained, that he was at the Beach Bar &
> Grill throughout the night and did not know his wife
> was home, and his mother-in-law's initial reaction that
> he could have killed Ellen.  Prosecutors surely had
> reason to continue their investigation into plaintiff's
> relationship with his wife, but they did not
> necessarily have probable cause to believe that he
> murdered his wife in the days immediately following her
> death.
>
> By April 6, 2001, though, the landscape had changed and
> the defendants had probable cause to believe that
> plaintiff was guilty of the crime.  By then, they had
> discovered that plaintiff's alibi was not tight.
> Though there was evidence that Ellen died between 2:00
> and 2:30 a.m. and plaintiff claimed he was at the Beach
> Bar & Grill from 9:00 p.m. until 4:00 a.m., no witness
> could testify that he was there the entire period.
> Instead, the witnesses provided a wide range of arrival
> and departure times, with plaintiff arriving somewhere
> between 11:00 p.m. and 1:00 a.m. and leaving between
> 3:30 a.m. and 4:00 a.m.  (See Kent Cert., Exs. 3-5, 26-
> 28.)
>
> Also by April 6, 2001, the prosecutors had Dr. Gross'
> supplemental report which again concluded that Ellen
> was a victim of homicide.[4]  They had also learned by

---

[4] Plaintiffs assert that this Court must change its probable
cause determination because Dr. Gross's supplemental report was
not signed until April 9, 2001.  (See Pl. Br. at 2.)  In
referring to Dr. Gross' report in the February 23, 2004 Opinion,
the Court considered the date of Dr. Gross's second examination
of the body on April 1, 2001.  (See Kent Cert., Oct. 1, 2003, Ex.

April 6th that plaintiff was estranged from his wife
and had threatened to hurt her on several previous
occasions.  On April 6, 2003, Calvin Gadd verified
reports by Sharon Hogan, Julie Goldberg, and Viola
McElroy that Ellen wanted to leave plaintiff but was
frightened of him because he had threatened to kill her
with his gun and with his car, and because he was
especially violent when intoxicated.  (Clarke Cert.,
Ex. B.)  That Ellen was found dead after her husband
returned from a night of drinking, given his past
threats toward her and his history of violence when
intoxicated, strongly heightened these defendants'
suspicions.  The supplemental report, coupled with the
other witness statements and evidence obtained between
March 31 and April 6, 2001, provided probable cause to
suspect plaintiff of the murder.

(Slip Op. at 56-58.)

The Court then explained that the exculpatory evidence

available to the Defendants in April 2001 did not negate the

existence of probable cause, stating:

The Court has considered the evidence which existed on
April 6, 2001 which was exculpatory toward plaintiff,
but finds that it did not eliminate the probable cause
that existed.

First, as noted above, the Beach Bar & Grill alibi was
not tight, the alibi witnesses were of questionable
reliability such as Mr. Andros' father who was highly
intoxicated, and investigators reasonably concluded
that even if Ellen was murdered at 2:00 a.m., plaintiff
could have been responsible.

Second, while Ellen's body showed no signs of struggle
which could indicate that she may have died of natural
causes, it could also indicate that she did not
struggle because she knew her attacker.

---

22.)  Plaintiffs are correct that while Dr. Gross dictated his
report about the second examination on April 2, 2001, he did not
sign the report until April 9, 2001.  (Id. at 9.)  The Court
finds, though, that this difference is not material.  At best, it
pushes the probable cause determination to April 9, 2001.

Third, while Dr. Gross' finding of asphyxiation by
suffocation was not entirely consistent with his
finding of pre-mortem petechiae, it was consistent with
a finding of asphyxiation and, according to Dr. Jason,
was the "most likely" explanation for her death prior
to viewing the slides which confirmed the alternate
basis.  (See Clarke Cert., Ex. H at 7.)

These defendants, being law enforcement personnel and
not trained in pathology, could reasonably rely upon
the medical conclusions of Dr. Gross as of April 6th.
The so-called "clearly exculpatory evidence,"
therefore, was not "clearly exculpatory" at the time,
even though it would eventually prove true.  The
defendants had probable cause on April 6, 2001 to
believe plaintiff had murdered his wife.

(Slip. Op. at 58-59.)

With this motion for reconsideration, Plaintiffs argue first
that the Court overlooked critical evidence that Plaintiff was at
the Beach Bar and Grill at the time of Ellen's death.  Moreover,
Plaintiffs assert that this Court failed to recognize that
Defendants knew Dr. Gross believed Ellen's death was two to five
hours after her last meal at 10:00 p.m., that computer evidence
supported the conclusion that Ellen died between 1:48 a.m. and
2:20 a.m., that witnesses placed Plaintiff at the Beach Bar and
Grill until 4:00 a.m., and that their expert, Anthony Mautone,
Esquire, concluded that this evidence required a finding of no
probable cause.  (Pl. Br. at 5.)  There is no support for
Plaintiffs' position.

10

The Court considered, in depth, this exculpatory time of death evidence,[5] but concluded that there still was sufficient evidence for a finding of probable cause in April 2001.  (See Slip. Op. at 59.)  Plaintiff's alibi was not tight; Plaintiff had a history of violent discord with his wife; Plaintiff had previously threatened to smother his wife with a pillow; and Plaintiff had historically been more violent when intoxicated.[6]

---

[5] The Court specifically noted that:

[W]itnesses placed plaintiff at the Beach Bar and Grill in Brigantine from about 9:00 p.m. until 4:00 a.m., (Compl. ¶¶ 14, 35), while other evidence indicated that Ellen died between 2:00 and 2:30 a.m., (id. ¶¶ 18,39.)  Computer records showed that she sent an e-mail at 1:48 a.m. and that her America On-Line account was logged off "due to inactivity" at about 2:30 a.m.  (Id. ¶¶ 18, 38; Kent Cert., Ex. 8 at 3.)  Medical evidence supported the 2:30 a.m. time of death as she likely died two hours prior to the arrival of emergency personnel at 4:31 a.m. when the first responders noted cold extremities and lividity, (Compl. ¶¶ 20, 22, 24, 39; Kent Cert., Ex. 16 at 7, id., Ex. 36 at 5), three to four hours after her last meal, which she finished between 10:00 and 10:30 p.m., (id. ¶ 39, Kent Cert., Ex. 7 at 3), and four hours prior to Barbara Fenton's arrival around 7:00 a.m. when she noted the presence of +4 rigor mortis in the neck and jaw, blanching livor on the face, mottling on upper arms, and thick livor on dependent areas of the body, (Compl. ¶ 39; Kent Cert., Ex. 19).

(Slip Op. at 11.)

[6] The Court explained that:

[T]hough several witnesses were able to place plaintiff at the Beach Bar and Grill during the early morning hours of March 31st, no one witness could verify that plaintiff was at the bar the entire 9:00 p.m. until 4:00 a.m. period as he said.  The bar's manager, Joseph Takach, told police that he thought plaintiff arrived around 1:00 a.m. and left around 3:45 a.m.  (Kent Cert., Exs. 3, 28.)  Plaintiff's friend,

All the evidence, including the time of death evidence, still suggested Plaintiff was the perpetrator of the crime.  In sum, this time of death evidence that Plaintiffs now point to has been fully discussed and considered, and provides no basis for relief on this motion for reconsideration.

Second, Plaintiffs assert that this Court's probable cause finding is flawed because the Court overlooked Plaintiffs' allegations that the Defendants relied on manipulated evidence about the time of Ellen's death.  (Pl. Br. at 6-9.)  They assert that the Court failed to recognize that an April 1, 2001 phone log shows that an investigator asked that "Dr. Park and Dr. Gross brainstorm the matter to get a time of death," (Pl. Br. at 5), that Plaintiff only needed an alibi for the period from 1:48 a.m., the time she sent her last e-mail, to 3:00 a.m., five hours after her last meal at 10:00 p.m., (Pl. Br. at 7), and that Defendant DeShields acknowledged at the Grand Jury proceeding

---

Christopher Howe, though, said that plaintiff was at the bar when he arrived around 11:00 p.m. and that he thought he stayed until "approximately 4:00 a.m."  (Kent Cert., Exs. 5, 26.)  The bartender, Tania Grossman also remembered that plaintiff had entered the bar around 11:00 p.m., but she thought he left "just before 3:30 a.m."  (Kent Cert., Exs. 9, 27.)  Another friend of plaintiff's, Brian Keena, said that he saw plaintiff at the bar and that he left between 2:00 and 3:00 a.m., but that he did not know when plaintiff left.  (Kent Cert., Ex. 4.)  Plaintiff's father told police that plaintiff had left the bar "little bit before me, I don't know exactly when" because he was so inebriated by that time that he spent the night in his truck in the bar's parking lot.  (Kent Cert., Ex. 2 at 2.)  Defendants, therefore, did not feel that plaintiff's alibi was tight.

that the "balance of the evidence [was] that Jim Andros was at the bar that night and most of that night." (Pl. Br. at 8-9.) Plaintiffs assert that this evidence establishes that Defendants knew Plaintiff was not at the house when Ellen died, but manipulated the evidence to create probable cause.  Therefore, Plaintiffs assert that this Court made a clear error in concluding that the Defendants had probable cause to suspect Plaintiff.

Contrary to Plaintiffs' position, the Court did consider the foregoing evidence in concluding that Defendants had probable cause to suspect Plaintiff.  With respect to the phone log asking Dr. Gross and Dr. Park to "brainstorm" about the time of death, the Court specifically referred to Plaintiffs' allegations that "Dr. Gross then met with defendants Hydow Park, M.D., Jeffrey Blitz, and Murray A. Talasnik, to 'brainstorm' how they could 'manipulate' the evidence to make it appear that plaintiff had murdered his wife."  (Slip Op. at 10 (citing Compl. ¶ 42).) Plaintiffs failed to point to anything in the record, though, suggesting that the phone log's request for a time of death was anything other than a legitimate request for an accurate time of death in a homicide investigation.

With respect to Plaintiff's alibi from 1:48 a.m. to 3:00 a.m., the Court specifically considered that "witnesses placed plaintiff at the Beach Bar and Grill in Brigantine from about

13

9:00 p.m. until 4:00 a.m., while other evidence indicated that
Ellen died between 2:00 and 2:30 a.m." (Slip Op. at 11 (citing
Compl. ¶¶ 14, 18, 35, 39).) The Court also explained the wide
disparity in the testimony of the witnesses who placed Plaintiff
at the bar. Since the Beach Bar and Grill was only 20 minutes
from the Andros home, an absence of as little as 45 minutes
around 2:00 a.m. would have sufficed for a round trip to commit
this crime. While they all seemed to agree that Plaintiff was
there between 1:00 a.m. and 3:00 a.m., their wide differences in
his arrival and departure times, which indicated his arrival
between 9:00 p.m. and 1:00 a.m. and his departure between
2:00 a.m. and 4:00 a.m., as well as their varying states of
intoxication and opportunities to observe and recollect his
comings and goings, simply did not make Plaintiff's alibi strong
enough to withstand scrutiny in the face of the inculpatory
evidence then known to the officials. In the end, Plaintiff's
alibi was valid and he was at the Beach Bar and Grill as he said
he was. However, the Court, based on the evidence available to
prosecutors and investigators in April 2001, explained that they
could have reasonably concluded that he probably committed the
crime.

In sum, Plaintiffs failed to come forward with evidence at
the summary judgment phase which could cause a reasonable
factfinder to conclude that no probable cause existed in April
2001. The Defendants were faced with the untimely death of a

14

healthy thirty-one year old female which had been ruled a
homicide, with evidence that she had been physically threatened
by her husband, and with evidence that the husband had been
twenty minutes away at a bar the night of her death while she was
home alone.   Taken together, it could have been reasonably
concluded that the evidence implicated Plaintiff in spite of his
alibi, given evidence of his expressed intent to kill her, his
motive, and his opportunity.

Similarly, despite the considerable time afforded in which
to take additional discovery, Plaintiffs have failed to come
forward with evidence at this reconsideration phase which could
cause a reasonable factfinder to question the existence of
probable cause in April 2001.   In their supplemental submissions,
Plaintiffs argue that additional discovery has yielded evidence
that (1) in the days following the victim's death Defendants
"believed that Mr. Andros had a corroborated and uncontradicted
alibi until between 4:00 a.m. and 4:30 a.m. on March 31, 2001,"
and (2) Dr. Gross informed the Defendants that the victim died
between 12:00 a.m. and 3:00 a.m. and, thus, that Defendants "were
aware that Ellen died well before 4:00 a.m. on March 31."[7] (Pl.

_____

[7] Plaintiffs rely on the following information gathered
through additional discovery in support of these claims: (1) the
disputed testimony of Dr. Gross that as of April 10, 2001 he had
relayed his time of death opinion to Defendants Yeats, Wellman,
DeShields, Blitz and Talasnik, and (2) his statement to DeShields
and Talasnik that it was "highly unlikely" that Ellen's time of
death was close to 4:00 a.m.   (Pls. Supp. Br. at 4.)

15

Supp. Br. at 1-2.)  This additional evidence, however, even if accepted as true for purposes of this motion, does not change the factual landscape shaping the Court's earlier discussion – (1) that the officers were aware of Mr. Andros's alibi, and (2) that Dr. Gross's autopsy report suggested a time of death inconsistent with that alibi.[8]

First, as already detailed, in light of the wide discrepancies in the testimony of the witnesses detailing Andros's arrival and departure times from the bar, as well as the witness's varying states of intoxication, Andros's alibi was not strong enough to withstand scrutiny.  Likewise, even considering the time of death evidence, other factors known to the officers, see supra, could have reasonably implicated Andros in spite of his alibi.  In any event, as the United States Supreme Court has recently clarified, it is well-settled that "an arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."  Devenpeck v. Alford, 543 U.S. 146, 125 S. Ct. 588, 593 (2004) (citing Wren v. United States, 517 U.S. 806, 812-813 (1996); Arkansas v. Sullivan, 532 U.S. 769 (2001) (per curiam)).  Therefore, even if, as Plaintiffs now argue, the additional discovery has yielded

_____

[8] To the extent there is a dispute of fact as to whether Dr. Gross informed each Defendant of his time of death estimate, for the reasons already explained at length, that dispute does not change the Court's probable cause determination.

16

evidence that the Defendants believed (or should have believed) that Andros was not present when his wife died, those subjective beliefs are not enough to overcome the objective facts creating probable cause to arrest Plaintiff in April 2001.

Finally, the Court disagrees with Plaintiffs' argument that the inconsistency between Dr. Gross's time of death opinion and Andros's alibi necessitates a finding that the officers "knew" that Andros did not kill his wife.  In the first instance, unless the officers knew either the alibi or the time of death estimate to be false, that evidence could have compelled nothing more than a belief that Andros was innocent.  And, as the Court pointed out above, "an arresting officer's state of mind . . . is irrelevant to the existence of probable cause."  Devenpeck, 543 U.S. 146, 125 S. Ct. at 593.  In any event, as the Court already explained: "The Court has considered the evidence which existed on April 6, 2001 which was exculpatory toward plaintiff, but finds that it did not eliminate the probable cause that existed."  (Slip Op. at 58-59.)  Nothing that Plaintiff has offered the Court together with the instant motion alters that determination.[9]

For the above reasons, this Court will deny Plaintiffs'

---

[9] That Defendants may have suppressed certain evidence in making their warrant application, as Plaintiffs contend (Pl. Supp. Br. at 9,) does not alter this Court's conclusion that there was probable cause to arrest Plaintiff on April 6, 2001. Rather, such misconduct is relevant, if it all, to Plaintiffs' malicious prosecution claim, discussed below.

17

motion for reconsideration of the probable cause determination. The matters asserted by Plaintiffs have been thoroughly considered and reconsidered by the Court and provide no basis for relief.[10]

## III. MOTION FOR SUMMARY JUDGMENT ON STATE LAW CLAIMS

### A.    Rule 56(c) Motion for Summary Judgment

Summary judgment is appropriate when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.

---

[10] Plaintiffs additionally assert that this Court's ruling regarding absolute immunity is flawed even if the probable cause determination is not changed because absolute immunity applies only to prosecutorial actions taken after the prosecutors had probable cause.  Thus, Plaintiffs argue that this Court should allow their federal claims to continue against these Defendants for actions taken prior to April 6, 2001.  Plaintiffs have failed to recognize, though, that this Court found that Defendants are entitled to qualified immunity for the federal claims for their actions which did not fall within the protection of absolute prosecutorial immunity.  See Slip Op. at 64 stating:

> In the end . . . all federal claims which have been asserted against Blitz and Talasnik, DeShields and Ortiz, will be dismissed, as the claims which remain after the Court's prosecutorial immunity decision fall within the doctrine of qualified immunity, as explained infra.

(Emphasis in original omitted).

18

In deciding whether there is a disputed issue of material fact, the court must view the evidence in favor of the non-moving party by extending any reasonable favorable inference to that party. Hunt v. Cromartie, 526 U.S. 541, 552 (1999).

The moving party always bears the initial burden of showing no genuine issue of material fact exists, regardless of which party ultimately would have the burden of persuasion at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). However, where the nonmoving party bears the burden of persuasion at trial, "the burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." Id. at 325. The non-moving party "may not rest upon the mere allegations or denials of" its pleading to show a genuine issue exists and must do more than rely only "upon bare assertions, conclusory allegations or suspicions." Fed. R. Civ. P. 56(e); Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985).

**B.   Motion for Summary Judgment by Blitz, Talasnik and DeShields**

Defendants Blitz, Talasnik, and DeShields seek summary judgment on all state claims asserted against them.[11] (Pl. Br. at

---

[11] The remaining state law claims as to Defendants Blitz, Talasnik and DeShields are:

```
Count 6   (malicious prosecution, state constitution)
Count 8   (malicious prosecution, common law)
Count 9   (defamation, state constitution)
```

6-7; Guernsey Aff. ¶¶ 13-17.)  For the following reasons, the
motion will be granted.

### 1.   New Jersey Statutory Immunity

Defendants Blitz, Talasnik and DeShields claim they are
entitled to official immunity under the New Jersey Tort Claims
Act, N.J.S.A. 59:3-1 et seq.[12] Specifically, Defendants claim
that they are entitled to protection from all state law claims
under N.J.S.A. 59:3-8[13] and, as to the false statement claims,
N.J.S.A. 59:3-10.[14] Finally, Defendants invoke the protection of

---

```
         Count 10  (conspiracy, common law)
         Count 11  (aiding and abetting, common law)
         Count 16  (false arrest, false imprisonment, common law)
         Count 20  (invasion of privacy, false light)
         Count 24  (negligence)
         Count 26  (abuse of process, state constitution)
         Count 27  (abuse of process, common law)
         Count 32  (intentional infliction of emotional distress)
         Count 37  (punitive damages).
```

The Court previously granted summary judgment on the two state
law claims which implicated Defendant Ortiz, namely Counts 18
(warrantless search) and 19 (invasion of privacy).  (See Slip Op.
at 71-72.)

[12] The scope of this immunity is limited by N.J.S.A. 59:3-14,
which eliminates immunity protection for an official "if it is
established that his conduct was outside the scope of his
employment or constituted a crime, actual fraud, actual malice or
willful misconduct."

[13] N.J.S.A. 59:3-8 states that "[a] public employee is not
liable for injury caused by his instituting or prosecuting any
judicial or administrative proceeding within the scope of his
employment."

[14] Under N.J.S.A. 59:3-10, "[a] public employee acting in the
scope of his employment is not liable for an injury caused by his
misrepresentations."

N.J.S.A. 59:3-3 as to all state law claims with the exception of those for false statements.[15] Defendants argue that the Court's finding as to federal immunity dictates an identical holding for the state claims.  Even though the Court's decision to grant summary judgment as to the remaining claims does not rest on immunity grounds, the Court will take this opportunity to clarify the relationship between state and federal immunities.

In Hayes v. Mercer County, the New Jersey Appellate Division "adopt[ed] the objective good-faith standard announced in Harlow [v. Fitzgerald, 457 U.S. 800 (1982)] as the standard to be applied in defining the good-faith component of qualified immunity under [59:3-3 of] the Tort Claims Act."  Hayes, 217 N.J. Super. 614, 622 (App. Div. 1987).  That standard is as follows:

> Qualified or good faith immunity is an affirmative defense that must be pleaded by a defendant official. . . .  [T]he good faith defense has both an objective and a subjective aspect.  The objective element involves a presumptive knowledge and respect for basic, unquestioned constitutional rights.  The subjective component refers to permissible intentions. . . . [Q]ualified immunity would be defeated if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff], **or** if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury.

Harlow, 457 U.S. at 815 (additional emphasis in original

---

[15] N.J.S.A. 59:3-3 states that "[a] public employee is not liable if he acts in good faith in the execution or enforcement of any law.  Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

omitted).   In other words, to lose the protection of qualified immunity under this standard, a Plaintiff must demonstrate <u>either</u> that the official violated a clearly established constitutional right <u>or</u> that the official had a malicious intention to cause an injury.

Defendants here argue that the Court's February 23, 2004 Opinion, holding that Defendants are entitled to qualified immunity on Plaintiffs' federal claims, necessitates a finding that the "good faith" standard under the Act is also satisfied. That presumption is not necessarily correct.  Indeed, the Court explained in its February 23 Opinion that "federal immunity does not extend to the state law claims asserted here."[16] (Slip Op. at 73.)  Unlike federal immunity, statutory immunity under the New Jersey Tort Claims Act provides officials with protection from liability, not from suit.  As the Third Circuit has explained,

> [t]he Tort Claims Act's dominant consideration of immunity and policy of deterrence are . . . consistent . . . with the view that the Act was intended to shield public officials and entities only from ultimate liability – and <u>not</u> initially from suit. . . .  Indeed, all of the many sections of the Act that provide for or negate the immunity of public entities and employees speak solely in terms of immunity from liability and not of immunity from suit. . . .  New Jersey cases construing the Tort Claims Act also are consistent with the view that the Act was not intended to confer immunity from litigation upon the state's public officials.

_____

[16] Nonetheless, Defendants continue to argue in their supplemental submissions and in Wellman's motion for summary judgment that federal and state immunity are coextensive.

Brown v. Grabowski, 922 F.2d 1097, 1108 (3d Cir. 1990) (citations omitted).  In sum, the Court's determination as to state law immunity need not mirror the Court's prior federal immunity decisions.

### 2.   State Law Claims

In the first instance, in light of the Court's determination that probable cause existed to arrest and prosecute Andros on April 6, 2001, the Court will grant summary judgment on Plaintiffs' claims for malicious prosecution (Count 6),[17] false arrest (Count 8), false imprisonment (Count 16), negligence

---

[17] To be sure, the Court is aware that where an indictment is procured by fraud, perjury, or other corrupt means, such as Plaintiffs have alleged here, (see Pls. Supp. Br. at 9,) the indictment alone will not suffice as prima facie evidence of probable cause for purposes of a malicious prosecution claim. Rose v. Bartle, 871 F.2d 331, 352 (3d Cir. 1989).  However, that a grand jury indictment is procured through such improper means will not, without more, defeat probable cause to arrest or prosecute.  Id. at 353.  Indeed, for the reasons explained at length above, probable cause here existed without regard to the truthfulness of the alleged misstatements.  See Sherwood v. Mulvihill, 113 F.3d 396, 399 (3d Cir. 1997) (false statements are actionable only if material to a finding of probable cause); Roberts v. Toal, 1997 U.S. Dist. LEXIS 1836, at *25 (E.D.Pa. Feb. 20, 1997) (holding for a section 1983 malicious prosecution claim that "a plaintiff's Fourth and Fourteenth Amendment rights are violated if information is knowingly or recklessly omitted from an affidavit [of probable cause] and the information, if included, would have vitiated probable cause" (emphasis added)). In any event, Plaintiffs' arguments that the prosecutor deceived the grand jury were already advanced and rejected by the Honorable Manual H. Greenberg, a conclusion with which this Court agrees.  (Clarke Cert., Ex. F(2).)  Accordingly, Plaintiffs' malicious prosecution claim fails as a matter of law.  Herman, 2003 U.S. App. LEXIS 8549, at *5 n.3 (holding the existence of probable cause operates as an absolute bar to claims for malicious prosecution).

(Count 24),[18] and intentional infliction of emotional distress
(Count 32).  See Herman v. City of Millville, 2003 U.S. App.
LEXIS 8549, at *5 n.3 (3d Cir. May 5, 2003) (holding probable
cause is an absolute defense under New Jersey law to claims of
false arrest, false imprisonment, malicious prosecution,
negligence and intentional infliction of emotional distress);
Wildoner v. Borough of Ramsey, 744 A.2d 1146, 1154 (N.J. 2000)
("[P]robable cause is an absolute defense [under New Jersey law]
to Plaintiff's false arrest, false imprisonment and malicious
prosecution claims.").

### (a)  Defamation (Count 9)

In Count 9 of the Complaint, Plaintiffs allege that
Defendants made false statements through various news mediums
that Plaintiff mentally and physically abused his wife, and that
he was responsible for her murder.  Because no such false
statements were made, Plaintiffs' state law defamation claim must
fail.

---

[18] A showing of wilful misconduct that would defeat immunity
under the New Jersey Tort Claims Act necessarily requires more
than mere negligence.  Marley v. Palmyra, 193 N.J. Super. 271,
292 (Law Div. 1983).  Indeed, "good faith" under the Act "may
exist in the presence of negligence."  Id.  In any event,
assuming Defendants owed a duty to Plaintiff, there was no breach
of that duty if Defendants had probable cause to arrest and
charge Andros.  See Herman, 2003 U.S. App. LEXIS 8549, at *5 n.3.

"A defamatory statement is one that is false and injurious to the reputation of another or exposes another person to hatred, contempt or ridicule or subjects another person to a loss of the good will and confidence in which he is held by others." Romaine v. Kallinger, 109 N.J. 282, 287 (1988).  Here, the public statements made by Defendants in several press releases were not false.  (Clarke Supp. Cert. Ex. A.)  Instead, they merely recounted the allegations mounted against Plaintiff.  Indeed, both press releases issued subsequent to Plaintiff's arrest but prior to the dismissal of the indictment specifically noted: "These charges are merely an accusation and not proof of guilt. In all criminal cases, a charged defendant is presumed innocent until proven guilty." Id.

To be sure, in the June 5, 2001 press release issued by the Atlantic County Prosecutor's Office, it was reported that Defendant Blitz stated that "[a]n autopsy indicated that Mrs. Andros died from asphyxia due to suffocation." (Clarke Supp. Cert. Ex. A.)  In fact, as it was later determined, the death was not caused in this manner.  However, both the initial autopsy conducted by Defendant Gross on Saturday, March 31, 2001, from roughly 11:00 a.m. until 2:30 p.m., and a reexamination on April 1, 2001, demonstrated to Dr. Gross that the death was caused by "asphyxia due to suffocation." (Compl. ¶ 25.)  Accordingly, Defendant Blitz's statement that the "autopsy indicated" death

from asphyxia due to suffocation was not false.  Accordingly,
Plaintiffs' defamation claim fails as a matter of law.  Summary
judgment as to Count 9 will be granted.[19]

### (b)   Invasion of Privacy – False Light (Count 20)

"[I]nvasion of privacy is not one tort, but a complex of
four.  The law of privacy comprises four distinct kinds of
invasion of four different interests of the plaintiff, which are
tied together by the common name, but otherwise have almost
nothing in common except that each represents an interference
with the right of the plaintiff 'to be let alone.'"  Runmbauskas
v. Cantor, 138 N.J. 173, 179-80 (1994) (quoting Canessa v. J.I.

---

[19] Additionally, New Jersey courts "have long recognized the
existence of a qualified privilege that confers immunity upon a
public official for defamation uttered in relation to matters
committed by law to his control or supervision."  Brayshaw v.
Gelber, 232 N.J. Super. 99, 112 (App. Div. 1989); N.J.S.A. 59:3-
10 ("A public employee acting in the scope of his employment is
not liable for an injury caused by his misrepresentation.").
Indeed,

> [a]lthough the communication of information to the news
> media may not be specifically [d]esignated as a duty of
> public officials, it is increasingly recognized that if
> this communication pertains to matters which are within
> the scope of an official's responsibilities, such
> statements should be regarded as being within the outer
> perimeter of the officials line of duty.

Brayshaw, 232 N.J. Super. at 111-12.  To be sure, immunity may be
lost if "the defamation is made with actual malice in the New
York Times v. Sullivan sense: 'with knowledge that it was false
or with reckless disregard of whether it was false or not.'"
Burke v. Deiner, 97 N.J. 465, 475 (1984) (internal citations
omitted).  Here, however, the Court has held that none of the
statements made were false.

Kislak, Inc., 97 N.J. Super. 327, 334 (Law Div. 1967)).  One of those four, placing plaintiff in a false light in the public eye, is the subject of Count 20 here.

It is well settled in New Jersey that a claim for "invasion[] of privacy involving publicity that unreasonably places the other in a false light before the public" is actionable.  Romaine, 109 N.J. at 293.  One of the elements of such a claim is, obviously, falsity.[20]

The same allegedly false statements identified in Count 9 of the Complaint form the basis of Plaintiffs' claim for invasion of privacy in Count 20.  As the discussion, infra, details, though, Plaintiffs have failed to identify any publicly false statements.  Accordingly, Defendants' motion for summary judgment as to Count 20 will be granted.

### (c)  Abuse of Process (Counts 26 and 27)

The Court's determination above as to Plaintiffs' malicious prosecution claim does not end the inquiry as to the abuse of process claim.

> An action for malicious abuse of process is distinguished from an action for malicious use of process in that the action for abuse of process lies for the improper, unwarranted and perverted use of

---

[20] The tort of false light is satisfied upon a showing that (1) the false light in which the plaintiff was placed would be highly offensive to a reasonable person; and (2) the actor had actual knowledge of, or acted with reckless disregard as to the falsity of, the publicized matter and the false light in which the other would be placed.  Romaine, 109 N.J. at 294.

> process after it has been issued while that for the
> malicious use of it lies for causing process to issue
> maliciously and without reasonable or probable cause.
> Thus it is said, in substance, that the distinction
> between malicious use and malicious abuse of process is
> that the malicious use is the employment of process for
> its ostensible purpose, although without reasonable or
> probable cause, whereas the malicious abuse is the
> employment of process in a manner not contemplated by
> law.

Baglini v. Lauletta, 338 N.J. Super. 282, 293 (App. Div. 2001)

(quoting Ash v. Cohn, 119 N.J.L. 54, 48 (E. & A. 1937)).

"Consequently, basic to the tort of malicious abuse of process is

the requirement that the defendant perform 'further acts' after

the issuance of process 'which represent the perversion or abuse

of the legitimate purposes of that process.'"  Id. (citations

omitted).  In other words,

> [t]he gist of this tort [of abuse of process] is the
> misuse of process justified in itself for a purpose
> other than that which it was designed to accomplish,
> and the essential elements are an ulterior motive and
> some further act after the issuance of process
> representing the perversion of the legitimate use of
> the process.  Bad motives or malicious intent leading
> to the institution of a civil action are insufficient
> to support a cause of action for malicious abuse of
> process.  A showing of some coercive or illegitimate
> use of the judicial process is necessary to a claim
> that there has been an abuse of the process.

Simone v. Golden Nugget Hotel and Casino, 844 F.2d 1031, 1036-37

(3d Cir. 1988) (citing Penwag Property Co. v. Landau, 148 N.J.

Super. 493 (App. Div. 1977)) (additional citations omitted).

The institution of criminal proceedings in this case, which

necessarily did not occur until the case was presented to the

grand jury on June 5, 2001, form the basis of Plaintiffs' abuse

of process claims.  (See Slip Op. at 66 n.21.)  First, Plaintiffs' allegations that Defendants lied before the grand jury, even if true, can not form the basis of an abuse of process claim.  Indeed, claims of perjury before a grand jury "deal[] with the initiation of the process, and not its perversion." Williams v. Fedor, 69 F. Supp. 2d 649, 673 (M.D.Pa. 1999); Mosley v. Delaware Riv. Port Auth., 2000 U.S. Dist. LEXIS 22402, at *33 (D.N.J. August 7, 2000) ("For the purposes of an abuse of process claim, 'process' does not include false testimony.")

In any event, Plaintiffs have not pointed to any evidence suggesting that Defendants became aware of the actual cause of death at some point after the issuance of process yet failed to disclose it.  To the contrary, the record reflects that as soon as the actual cause of death was confirmed, the indictment was dismissed.  As the Court recounted in its February 23, 2004 Opinion, Dr. Jason's November 30, 2002 report was the first indication that Ellen Andros had died of natural causes.  On December 2, 2002, Dr. Park indicated that he agreed with that conclusion.  And, on December 3, 2002, Dr. Gross wrote that he also concurred.  The very next day, the motion to dismiss the indictment was granted.  Far from perverting the process, Defendants ensured that justice was done.  The facts before the Court can not as a matter of law support a claim for abuse of process, and summary judgment for Defendants will be entered on Counts 26 and 27.

29

**C.   Motion for Summary Judgment by Wellman**

On December 3, 2004, Plaintiff filed suit against
Christopher Wellman, a captain in the Major Crimes Unit of the
Atlantic County Prosecutor's Office, based on identical facts
alleged in Plaintiffs' original complaint.  The actions were
consolidated on December 21, 2004, and Wellman filed a motion for
summary judgment on April 8, 2005 seeking dismissal.  For the
following reasons, the motion will be granted.

First, the Court will dismiss, because of federal immunity,
all federal claims against Wellman.  The Court's earlier
discussion in connection with its federal immunity determination
for Defendants Blitz, Talasnik and DeShields applies with equal
force here and will not be repeated.

Additionally, there is no evidence in the record suggesting
that Wellman was involved with the Andros investigation beyond
its initial stages.  The following fairly summarizes that limited
involvement:

- Andros placed the 911 call at 4:27 a.m. on March 31,
  2001.  Between 6:30 a.m. and 7:00 a.m., Wellman
  received a call from DeShields who was already at the
  Andros home.  Wellman arrived at the home shortly
  thereafter, at which time he was debriefed by
  DeShields.  Wellman proceeded to walk through the
  house, place a call to Assistant Prosecutor Dean Wyks

to report on the situation, and then leave the
premises.  (Clarke Cert. Ex. G, Wellman Dep. Tr. at 24-
25.)

- Later that same day, Wellman received a call at his
  home from Investigator Yeats, who had attended the
  autopsy, and advised Wellman that Dr. Gross had ruled
  the death a homicide.  Specifically, Yeats informed
  Wellman that Gross had determined the cause of death to
  be asphyxiation by suffocation.  Wellman then spoke in
  person with Dr. Gross to confirm Yeats's report.  Gross
  repeated his conclusion to Wellman that Ellen died two
  to five hours after her last meal.  (Id. at 25-26.)

- On April 3, 2001, a double homicide occurred and
  Wellman's involvement in the Andros investigation
  effectively ceased.  (Id. at 40:10-21; Kent Cert. Ex.
  E, Wellman Dep. Tr. at 63.)  Although Wellman executed
  the arrest of Andros on April 23, 2001, (Kent Cert. Ex.
  E, Wellman Dep. Tr. at 61,) he had no involvement in
  the determination to arrest Andros.  (Clarke Cert. Ex.
  G, Wellman Dep. Tr. at 30.)

As the foregoing makes clear, Wellman's participation in the
investigation was extremely limited.  In any event, even
accepting Plaintiffs' arguments that Wellman "shared the same
knowledge" as Blitz, Talasnik and DeShields in connection with

31

his role in the investigation, the Court has already held that information to be insufficient to support any of Plaintiffs' state law claims.  Accordingly, for the same reasons expressed above and in the Court's February 23, 2004 Opinion, the state law claims will be dismissed as well.

For these reasons, all claims against Defendant Wellman will be dismissed.

## IV.  CONCLUSION

For the reasons explained above, the Court has concluded that Plaintiffs' motion for partial reconsideration will be denied.  In addition, the Court will dismiss the remaining state law claims against Defendants Blitz, DeShields and Talasnik. Finally, all claims against Defendant Wellman will be dismissed. The accompanying Order is entered.

December 21, 2005                     **s/ Jerome B. Simandle**
Date                                  JEROME B. SIMANDLE
                                      U.S. District Judge